and remand this case for a new trial. Alternatively, we requested that the court reverse this conviction for lack of evidence regarding the intent of Mr. Johnson to commit the crimes at issue herein. Relating to the Batson issue, which this court will review on the issue of clear air, I asked the court to first begin and look at this from a micro level. What are the jury voir dire? As we begin, there's a spontaneous statement by government's counsel to the district court when the court addressed the issue, the Batson issue. And first and foremost, the government counsel stated, quote unquote, flagged her because I even knew, before I even knew who she was. It begins to unfold the pretextual nature for dismissing the African-American juror. Mr. Johnson, as an African-American, seeking a jury of his peers. The court continued on. There were two reasons, there were eight total reasons given by the government counsel to excuse this juror. Two of the reasons were not based in fact. The issue as, well, she only had a GED and it was clear that she had finished her college education. Secondly, she had not filled out a jury questionnaire, yet that wasn't based in fact. And as it's set forth by the United States Supreme Court in Foster versus Chapman, reasons for race-neutral decisions need to be grounded in fact. Those two reasons that were given by the government counsel clearly were not based in fact and further show the pretextual nature of the basis for excusing this juror. Did either party ask this particular juror any questions? Neither party asked her any questions. How much time do you get for jury selection in this district? So how much time would each party have? If I'm not mistaken, and this is off the top of my head, I believe that each side had 30 minutes of voir dire questioning. At least 20, possibly 30 minutes. There was, moving on to the third reason, which was the government counsel indicated that, well, she had listed in her jury questionnaire that her father had been killed. Government counsel assumed that that meant that her father had been murdered. There were no questions by government counsel as a but there was a thorough voir dire done by the district court as to the issue of family issues and financial burden. Three questions were posed to the panel. The juror, Nashawn W., the juror at issue in this case, or the potential juror at issue in this case, never raised her hand. Government counsel, given full opportunity to ask her any questions, asked her none. Yet you will note in the there was one other African-American juror who was asked for, there were four pages of questioning during, in the transcript by government counsel of that juror. Government counsel had plenty of opportunity. If there was an issue for cause, as what voir dire is all about... But what is the obligation of a prosecutor to ask follow-up questions? Because isn't that kind of what you're getting at, that there were things that the prosecutor was relying on in the questionnaire that this particular potential juror didn't speak to. What's the law on that? What's the case law? What's the obligation? The obligation in this particular case is when you're asking, you're going to use this or their reason to base the race-neutral decision and you're based upon assumptions that were made that are not a part of the record, then it's not factually based, as is required under Foster versus Chapman for making the race-neutral decision. So if your race-neutral decision is based upon, I believe the father was murdered, when there's no record of that the father was murdered. Killed could mean accidentally killed, could have been a car accident, could have been hit by a car, fell. We don't know what that was and if that was a concern for government counsel, when they raise it in their race-neutral decision or basis for their decision, it is their obligation at that point. Especially when, again, when we look further into the record because there were five other race-neutral decisions that were given. She was young, she was a renter, she was a single mom, she had a child who was 18 The majority, overwhelmingly, nine of the jurors, all Caucasian, gave the same or similar answers and they were not excused and yet were allowed to remain on the jury and sit and decide this case. So as a factual matter, this particular potential juror didn't answer any questions, didn't offer up any answers, is that correct? Didn't offer up any questions that were posed by the district court to the jury panel or the voir dire panel. But there were white jurors who were seated on the jury who did the exact same thing? Yes. Nine of them, in fact. Well, wait a minute, wait a minute, wait a minute. Is that collectively or is that, were there nine individuals who had the exact same profile? Yes. Are you saying collectively they had those characteristics? And I could break it down for the court, but when it came to nine jurors that sat and made a decision in this case, nine of them, when posed questions by the district court, never raised their hands, yet they were allowed to remain on the jury and decide this case. So in that argument, you're essentially arguing that this juror was silent, other jurors were silenced. To use silence as a basis for a race-neutral decision is belied just because the similarly situated people were treated disparately, right? Yes. Okay. Now, I'm a little more curious to follow up on what Judge Kelly was talking about, because the prosecutor here says that the father was killed was very disconcerting or very concerning. I think those were the exact words that the prosecutor used, and yet never bothered to ask any specific, particularized question of this particular juror. And is that alone enough to say that they violated some obligation, that once it's triggered in your brain that it's of great concern to you, you have some obligation to follow through? Is that your argument? That's part of my argument, certainly. I mean, you have to look at it in terms of why weren't questions asked if that was a concern, especially the whole purpose of voir dire is to determine whether there's cause or not for a particular juror to sit in this case, or whether they can be biased. So if that was a big concern, in light of the ambiguity, killed does not mean murdered. But that was the assumption that government counsel made in this case in order to get to their decision, make their race-neutral decision. Now, I would point out in the Miller L. case by the United States Supreme Court, not quoting, but paraphrasing, race-neutral reasons become race-specific when the government did not excuse white jurors who had the same issues, and they remained on the jury. Now, I also want, I ask this court to step back, not only to do the micro-analysis, but to do the macro-analysis, because I think this is essential. All minorities were excused from this jury pool by the government. Half of their peremptory challenges were used to excuse minorities on this jury. And there were no reasons given by the juror that was excused, that was unique to her, that didn't apply to the other jurors that remained, that provided the basis. Mr. Evans, you're well into your rebuttal time, so if you intend to keep any, you're welcome to continue, but, okay. I've reserved one minute, thank you. Very well. Ms. Grieva? Good morning, Your Honors. My name is Mary Grieva. I am appellate counsel for the defendant, Mr. Lubachin. As the court is well aware, I was not trial counsel in this matter, and I would like to be heard today on the single issue of sufficiency of the evidence, if I might. I know, judges, that I did raise issues regarding a Miranda issue that was brought forward at some point during the course of the trial by trial counsel. I would like to just submit on that and also submit on the search issue. Could I, just before you get into the sufficiency, what exactly, what statements are you saying were improperly admitted as a result of the Miranda violation? I believe that when the traffic stop initially occurred, my client, Mr. Lubachin, was the driver of the vehicle. I have reviewed the Coleman case from the circuit, which the government argues is on point, and in some respects, it is, Judge. In that Coleman issue, in the Coleman case, I believe the court found against the defendant, finding that the law enforcement officer had a right to ask the questions of the driver of the vehicle, that it was not a custodial situation where Miranda was mandated. What I would very briefly on that point like to draw the court's attention to is that there were some distinctions between Coleman and Mr. Lubachin. And I don't want to take up all of your time. If you want to shift to just sufficiency, I was just wondering what it was you wanted suppressed. It was the questioning done by law enforcement on the side of the road. I believe during the course of the trial, Mr. Lubachin testified that he, in fact, felt he was not free to leave and that he had to answer those questions. So my argument briefly would have been that it, in fact, had been more custodial since it's really a subjective test as to what's in the defendant's mind as to whether he's free to leave or not, at least from my defense perspective. As to the sufficiency argument, my client was convicted of both possession with distribution and with conspiracy. And in reviewing case law from the circuit, both United States versus Juliet Stark from 1991 and also the Aponte case from 2010, it appears, judges, justices, excuse me, that there is a complete lack of evidence as to knowledge on the part of my client, both as to whether the drugs were in the vehicle. He was, I would proffer, he was a mere occupant of the vehicle. He was not the person who had contracted for the rental of the vehicle that was being driven from Los Angeles to the state of Illinois. The drugs found in the vehicle were found in an attachment to the vehicle in a spare tire. I believe there's no evidence showing my client at any time inspected that tire or was aware of the drugs in the vehicle. And I would call the court's attention once again to the Aponte case from 2010. In addition as to the conviction of the conspiracy count, going back to the 1991 case that I cited, United States versus Stark, I believe, judges, that there is a lack of evidence that there was any agreement entered into between my client and the co-defendant that there was any knowledge whether actual constructive of the drugs in the vehicle and lastly that there was any criminal intent to distribute those drugs. If there's any questions from the court, I would be happy to entertain them at this time. Other than that, I would submit. Very well. Hearing none, thank you, Ms. Grieva. Thank you. Mr. Convoy for the government. Mr. Evans, Ms. Grieva, ladies and gentlemen of the court, because the issue was submitted as to the traffic stop in the Miranda that happened on the side of the road, I'm not going to address it that much. I think this court is well aware that a traffic stop is not equivalent to an arrest. Questions that were posed by Deputy Olson in this matter were run-of-the-mill, typical questions, purpose of the traffic stop, where are you going, who are you going to visit, how long are you going to travel, things of that nature. There's no indication in the record, in fact, it contradicts that there was an arrest. Mr. Labakian was told that he was just getting a warning ticket. The purpose of the traffic stop was never prolonged. The deputy was doing the roadside questioning while completing the function of the traffic stop. So there's nothing in the record that shows that this was a custodial interrogation. And as such, I would ask the court to find that the Miranda issue, the court did not err by denying the motion to suppress as it relates to the Miranda issue. The issue that was raised by Mr. Johnson as it relates to the Batson challenge, there were three minorities on the juror, excuse me, that were prospective jurors. The first one wasn't addressed, wasn't brought up here. It was a young male. We knew that his first name paired the record that's before he was Ricardo, but other than that, there was no other indication that he was actually a minority. The district court, assumed for the sake of argument, heard the argument itself as why the Batson challenge related to him. But the court also agreed and said, I don't really think that he is in a protective class. Regardless, that particular prospective juror was not contested further once a race-neutral reason was given. The same with juror number seven. She was the other African-American female that was stricken as well. And that was pretty clear as well. This was a lady who indicated that her brother was in federal court multiple times most recently, and was currently in federal court for drug charges. While it's been implied there were four pages of questions, it was more four pages of her talking through general questions, volunteering information, did not agree with the drug laws. And again, her being excused from the jury or being struck, that was not contested. I think it was a given under the circumstance, especially as much information that she provided the court really made it a risk to have her on the juror as a juror. The third juror, now that most of the focus has been on juror number 27. Again, this was a very young African-American female. She did fill out the questionnaire. That's not disputed. I don't know what reference it is that the government argued that she didn't fill out a questionnaire because it was not contested. In fact, that was our argument. She filled out the questionnaire. And in that questionnaire, she did put down some reasons prior to the jury trial starting. Prior to the jury walking in, we were given the questionnaires, and we can refer to them. And the way I was trained when I started doing this stuff was we got the red pen and the blue pen. And as you go through and you see, okay, this is good, blue pen, blue pen. On the other hand, if you start getting into facts that make you worried about having a prospective juror sitting in a trial, you use the red pen. But in part, your memory of it was, for example, GED, and she had a college education. That's correct. So part of that initial red pen, blue pen was not an accurate memory of the questionnaire? Memory, yes. Accurate as to the questionnaire, yes. Well, as to your reasons, as to your reasons. You assumed from your memory that she was a GED. So let's talk about some of the other factors. Let's start maybe where we left off with the appellant's counsel. What is your obligation to follow up if you have some questions about something that concerns you? For example, the issue of she identified that her father had been killed and that I understand one of the reasons that you gave was that you thought her father had been murdered. Certainly. There is no obligation that I have to ask potential jurors specific questions. And as a general practice, I generally don't, depending on what the topic is. She was not the only one that put down that she was a victim of a crime. There were other jurors that put down, for instance, they were sexually assaulted. And I don't go into those type of questions. There's a number of reasons. One, I don't want to put this young lady on trial herself as I ask her questions. And I understand. I mean, I understand the reasons why you wouldn't want to ask some very personal questions. Putting aside the issue of whether you could do a sidebar, I guess the question maybe more directly is, if you're going to make an assumption about an answer, it's not clear from her answer in the questionnaire, then do you have an obligation to follow up or else not rely on it? Well, first of all, the question that we're referring to was in the jury questionnaire. It says, have you or any member of your family been a victim of a crime? And she put down, my father was killed. So whether or not it was some type of negligent homicide or something along those lines, I think it was pretty clear that he was a victim. He was killed. Now, whether or not that's murdered or it was obviously, I don't think it was he fell, as argued. But, again, I could try fleshing that out. And even in a sidebar, I still think you run the risk of having people question, you know, why is she being brought over to the side? You know, I don't want to alienate the jury. I don't want to put her on the spot. And I also don't want to create the image that I'm trying to find reasons why to exclude a particular person. And I don't, I just. And so what was your reason for, what was the reason for excluding her based on that answer? It was an aggregate of factors. The question that was asked by Judge Grunder was, is this, the characteristics that I cited, were the other jurors on the jury, was that an aggregate? And, yes, it was. It took all of the other jurors to have a number of the same factors of this one particular person. I didn't argue that she was young, but I did say that she was a single mother. She did just move into a house that she rented. And just like that, and it's hard for me to remember, so I had to refer to my sheet so I don't get it wrong, but she only lived there for a month. And to be clear about one issue, as you noted before, we didn't have our questionnaire when we first went up there. We had a number of documents. We were talking about it. The issue was brought up for the Batson. And I think the record's pretty clear where I say, I think, and the court report was even typing down the dot, dot, dot as we were pausing, as we were filing through the notes going, you know, Judge, I think it was, I think it was, it was G.D. And then we said, wait a second, let's just grab the questionnaire, and we came back up. And then we addressed the Batson challenge, and then we went through it, and then we were very specific as to the reasons. I want to make it very clear. This wasn't something that somebody said you messed up or somebody said you were incorrect. This was just once we got back up there, then we started to address it again, then we got the facts right. Never brought up the education again or anything of that matter. But after the pause, after the break, after we returned to our tables, the judge, myself, opposing counsel, all went back, got our paperwork, came back up there, and we started again. Then we went through it. Then we started citing the specific reasons. So when we talk about the fact that she was a single mother with a young 18-month-old child, there were other jurors that did have young children. There were other jurors that had, that were single. There were other jurors that rented places or had just moved in. None of the other jurors had all of these factors. In fact, it was hard to say that any of those jurors had two of the multiple factors. I think one of the concerns you had was that it was going to be a burden on her to serve. That wasn't one of the main arguments. In fact, it was the district court that brought it up first and said, I think also in the aggregate, cumulatively, this is going to be a burden. I guess what I want to follow up on, and we can sort of look at the record to see how much of a factor that was in the decision, but if I understand correctly, this district court asks the question, will serving on a jury of this number of days be a particular burden for anyone? She didn't say yes, and I don't know that if anybody did. Is it then proper to assume that she was wrong and that she wasn't telling the truth in silence being that it wouldn't be a burden for her? Well, that's a particular problem with this particular juror. She didn't answer any questions, even questions that we knew were relevant to her, so it's kind of hard to say whether or not she, by silence, was acknowledging or admitting. What questions were asked of her that were not answered that were specifically relevant to her? Certainly. As almost the exact same question that was on the jury questionnaire, the court did ask her, in criminal matters, have you, a family member, or even a close friend, been a witness, a victim, or a witness, defendant, victim, or witness in a criminal matter? And she didn't raise her hand, even though, as we're all aware, she did put down that her father was killed. So we would assume something at that point if her father was a victim, and she had answered that question on paper earlier, but now in the courtroom was not providing information. Do we know how her father was killed? No, we do not. Do we have any idea at all whether he was killed in an automobile accident, killed in a criminal incident, killed by a slip and fall? Do we have any idea at all what the cause of death was? No, we do not. So how can you infer that her failure to answer that is a statement that she didn't recognize that her father had been a victim of a crime when he may never have been a victim of any criminal act? I think just because the way the questionnaire is written and the way the question was asked in court implies that it's a criminal act. And keep in mind, this isn't just a risk to the prosecution. I'm not just so much worried that she's going to get up and say, somebody killed my father and got away with something, or I don't agree with the criminal justice system. She could very well have been pro-government and felt like a defendant or somebody that had killed her father got away with a crime. It's the inherent risk itself that we don't know. You're right, it is an assumption. Well, isn't the inherent risk if you don't ask the questions that you're stuck with the non-answers, and then you're left with just this complete speculation? And if you look at, was it Flowers v. Mississippi and where Kavanaugh was in his opinion just last term, I mean, you're looking at somebody who really is not very much different than all the white people that you left on this jury, right? Well, no, because we also have the other reasons as well that we talked about. The other, as the district court said, they're both persuasive and reasonable. But the portion that we're referring to, then we're back to the beginning of the argument. Do I try fleshing out this information? Did you ask the judge to pose the questions? I mean, I sat as a judge for 24 years in trial cases, and I routinely asked these sorts of questions. And if anybody had any suspicions that there might be a problem rather than doing sidebars, I always said, ask me to ask them. I'll ask them. That might have been an option. That was not an option that we discussed at the time. Considering a sidebar, that was one thing. Whether or not we would have asked the judge to take our time and to question the jury, it's just something that normally I wouldn't have done or have seen done. Again, there's another multiple reasons why she was stricken, and it's not just that one particular reason. Can I ask a question to sort of follow up on this conversation? I understand there was someone on the jury who had herself been a victim of a sexual assault? He, actually. Okay. Did that person answer the question when posed by the district court? No, Your Honor. And I struck that person as well. So there was no one on? I thought there was someone on the jury who had been a victim. Is that not correct? I don't believe that's correct, and I don't know if anybody cited that. It was just a statement where... Maybe I had the record wrong. Correct. We're running out of time here. I would, if the court doesn't have any problems, jump into the sufficiency issue as well. The one thing I'd like to point out before I run out of time is Mr. Labakian testified, and even though Mr. Johnson did not testify, the jury did get to hear Mr. Johnson's interactions with the law enforcement officers, both at the traffic stop and in a post-arrest interview he gave. The jury is in the best position to judge the credibility of these witnesses. Mr. Johnson also called a bunch of other witnesses to kind of cloud the issues, and the jury heard these, and they could reject it and say this testimony is pretty incredible. I am out of time unless anybody has any further questions. Thank you very much. Thank you, Mr. Conboy. Mr. Evans, I think you have a little time left. Thank you. I will be brief because I have to. You've asked what is the legal obligation that the government had to ask, and there's no general legal obligation to ask any questions of anyone on the panel, you know, prospective jurors. But when there are questions in their mind, and as Foster v. Chapman states, that race-neutral reasons must be based in fact that are in the record in order to be legit. Mr. Evans, isn't it pretty clear when the question is, do you have a family member who is a victim of crime and the response is, my father was killed, isn't it pretty obvious that it wasn't a traffic accident? It could have been a DUI. It could have been somebody who is driving their car negligently. It could be a vehicular manslaughter. I don't know the answer to that question, and if it's the government's reason for the race-neutral decision, then they're obligated to ask. But it pretty clearly implies some involvement with the criminal justice system, doesn't it? It could. How could it not and still be a victim of a crime? But I guess what the government assumed was that the killed meant murdered, and that's not necessarily true, and there's a big difference between an accidental death… No, I think the underlying concern is interaction with the criminal justice system, right? And if I may, just to add this, I know I'm over my time. I believe government counsel is incorrect. There were two jurors, Rhonda L. and Elisa F. Both of them indicated they had been victims of a crime. Both of them remained on the jury. Both of them were Caucasian or white. Did they answer the question from the court? I don't believe so. We'll take a look at the record. Thank you. Mr. Evans, we appreciate your acceptance of the appointment under the Criminal Justice Act. It was an honor, and I thank you very much. And it's great to be here, and thank you. Thank you all. Ms. Grieva, you had a short amount of time, if you'd like a little rebuttal. But if not, that's fine, too. Thank you. Once again, counsel of the court appreciates your appearance and arguments today. I think they were helpful. The case will be submitted and decided in due course.